The defendant appeals from an order of the District Court extending a harassment prevention order pursuant to G. L. c. 258E, inserted by St. 2010, c. 23. He argues, inter alia, that the plaintiff, who is his father, failed to meet his burden of proving harassment under the statute and that the order interferes with his right to petition as well as his freedom of speech. He urges us to determine that the plaintiff's "efforts to mislead the court" constitute fraud on the court and he seeks to expunge all record of what he characterizes as an improperly issued order. We affirm.
Procedural Background. This case has a slightly unusual history. The plaintiff appeared in the District Court seeking an ex parte harassment prevention order against his forty-eight year old son in February, 2015. The judge (first judge) issued the order and scheduled a hearing after notice. At the hearing after notice, both parties testified before a second judge, who extended the order until February 26, 2016. The defendant, now represented by counsel, filed a notice of appeal from the extended order to this court. There were further hearings in the District Court, before the first judge, on February 26, and March 17, 2016, as described infra. On March 17, 2016, the first judge extended the harassment prevention order permanently.
After the issuance of the February, 2015, one-year order, but prior to the issuance of the permanent order, a panel of this court heard the appeal from the February, 2015, order. On April 27, 2016, the panel remanded the matter to the second judge in the District Court for findings of fact; the panel retained jurisdiction. "In response [to the remand order], the judge ... declined to make findings, reporting that the transcript [did] not sufficiently refresh his recollection." Syrjala v. Syrjala, 89 Mass. App. Ct. 1135 (2016). The panel then concluded that the record from the February, 2015, extension hearing "does not show that the requirements of the statute have been satisfied," and "vacate[d] the one-year harassment prevention order" in a memorandum and order pursuant to Appeals Court rule 1:28. In so doing, the court noted, "We recognize that there may well be no practical effect of our ruling. The one-year order at issue in this case has been superseded by a permanent order for which the judge has made detailed findings. However, those findings are based on information that was not part of the record (either below or here) with respect to the one-year order at issue in this appeal and therefore they have no bearing with respect to the question before us." Syrjala, supra n.3. That permanent order is the subject of the present appeal.
Hearing on February 16, 2016. At the hearing on the permanent order, the plaintiff testified that, in 2009, when his adult son became ill with Lyme Disease, the plaintiff and his wife offered "to let him come and live with us." They paid for "most of his medical prescriptions, nutritional supplements, doctor's visits, which were numerous." The plaintiff testified that "none of this was covered by insurance so we footed the bill for that and were happy to do so." At the hearing on February, 22, 2016, he summarized the harassment for the judge:
THE PLAINTIFF : "I found [the defendant] lying upstairs in a room. He has heart issues so I called the ... EMTs. I thought he needed to go to the hospital. I thought [the defendant] was having perhaps a heart attack or something serious. [The defendant] refused to go. Uh, accused me of attempted murder. Accused me of dragging him out into a blizzard."
THE PLAINTIFF'S LAWYER : "Did you do that?"
PLAINTIFF : "No, absolutely not. And then the next morning at four [ A.M. ], uh, I was awakened by additional ... [p]olice officers. Uh, [the defendant] had called them again. Told them I had tried to break down his door. I was trying to kill him. And it, it was all lies. Um, as pointed out factually in all the numerous police reports, uh, they were at our house probably seven or eight times. And he accused me of, of a lot of other vile things. Locking up his medicine. He reported me to the [Department of Children and Families(DCF) ] as a danger to my grandchildren. He reported me to the State agency for, uh, disabled persons That I was ... had abused a disabled person. He put numerous vile postings on Facebook."
Later in his testimony, the plaintiff said that "more recently we have been served with a lawsuit suing us for 1.3 million dollars."
The plaintiff also testified that the defendant sent him an electronic mail message (e-mail) that said, "Once again, ... you placed me in extreme medical danger once again, intentionally, in addition to last week's murder attempts ... I have legally-possessed lethal weapons in my room, which I will use in self-defense if necessary." The plaintiff testified that this particular e-mail caused him to feel very afraid because he believed "the defendant is mentally unstable and [the plaintiff had] no idea what [the defendant] is capable of doing. All [he knew] is that [the defendant] has developed a hatred for his mother and his father. [He didn't] know where that came from."[2]
The judge made preliminary findings on the permanent order at the end of the hearing on March 17, 2016.[3] The judge made "additional, more detailed findings of fact ... as ordered by the Appeals Court" on May 4, 2016, and, according to the record, they were transmitted to this court on May 9, 2016.[4]
The judge's decision. In his findings, the judge unequivocally found the plaintiff credible "about the numerous blatantly false claims made by [the defendant]. [The claims] were made knowingly by [the defendant] with the intent of disparaging, embarrassing and otherwise causing his father anxiety and fear for his personal safety. He also feared and continues to fear that his son may cause damage to his home and other property as a result of his threats."
The judge gave particular examples:
"On 2/17/2015, [the defendant] filed a complaint with the [Massachusetts] Disabled Persons Protection Commission stating that the plaintiff had dragged him down the stairs and onto the snow. The report was forwarded to the [local] [p]olice for investigation and found to be totally fabricated. On 2/23/2015, the [p]laintiff was notified by the [local] [p]olice that DCF had asked them to investigate a report (filed by the [d]efendant) regarding two grandchildren whom [the plaintiff and his wife] care for two days per week. The report claimed that the two grandchildren were in danger because of the [p]laintiff. DCF also interviewed the [p]laintiff's other son, ... who is the children's father, about the matter. This report was found to be a total fabrication by the [d]efendant, meant to harass and intimidate the [p]laintiff.
"As a result of [the defendant's] hostility and threatening actions in the home, the [p]laintiff and his wife became fearful. They began locking their bedroom door at night and pushed a file cabinet in front of the door. On 2/14/2015, the [p]laintiff's wife became afraid that [the defendant] would cause her harm, so she began staying at a hotel. The [p]laintiff stayed at the house to protect his property and business. He continued to always lock his bedroom door and kept a file cabinet behind the door for safety at night.
"The [d]efendant has posted numerous e-mails of a threatening nature such as the following. He threatened his parents with legal action to take away [their] money and the parent's company. He said a large civil lawsuit is on the way for attempted murder. He posted, 'I have weapons ready in case [the plaintiff] tries to stab me .... Jail is not very compatible for a 72 year old.' [The defendant] posted on Facebook on 1/14/2016 that he filed multi-million dollar lawsuits against the [p]laintiff, members of his family, and the [local] [p]olice, and he has apparently filed several such lawsuits seeking millions in damages.
"The [p]laintiff feared that his son's words and actions were threatening and harassing. He feared that his son, the [d]efendant, would act on his threats to harm him, his family, and his home and business. His fears were reasonable and he continues to be in fear of what his son may do in the future to cause him harm."
The evidence admitted supports the judge's findings. In addition to the plaintiff's testimony, another son of the plaintiff also testified as did the plaintiff's wife. The other son was employed in the family business, which operated in the basement of the plaintiff's home. He testified that his father was in his seventies and that the defendant's actions had distressed his father to the point that his father could not focus on work "still to this day, more than a year later [because of] [c]ountless legal proceedings. Getting a lawsuit filed against him. Pouring through Facebook posts ... his friends sending him screenshots of Facebook ...."
That son also offered a copy of a report from the DCF after an investigation of the complaint that the defendant had filed regarding alleged neglect of the son's two young children who had been staying at the plaintiff's house with their grandmother, during school vacations for one child and a couple of days a week for a younger child. The document was marked as an exhibit and appears in the record. The complaint to DCF described the alleged neglect as permitting the children to remain in the home despite the fact that the plaintiff had "attempted to murder" the reporter three times the previous weekend.[5] According to the DCF screener's redacted report on the defendant's complaint, the screener telephoned the children's father who said that he knew that the reporter was his forty-seven year old mentally ill brother. The children's father reported to the screener that his brother "is calling the police constantly saying things that are 'categorically, not true.' His father has not been arrested and there are no murder charges pending. His father did not try and hurt his older brother. [The children's father] said at this point his brother is calling the police frequently and making (false) reports about their dad so police are well aware of the family. His brother makes up 'wild claims.' [The children's father] believes that his brother has had a 'total break of reality.' "
The screener also spoke with a sergeant from the local police department, who was aware of the situation in the home and told the screener, "In the last [fourteen] days, police have had to respond to the residence no less than [fourteen] times. There are log entries but no police reports. There are ongoing issues between [the plaintiff], who runs a business in the basement of his home and his 47 year old son, [the defendant]. The son reports that he is on permanent disability, takes medical marijuana and other homeopathic medications for Lyme Disease. The son is trying to create havoc. (blacked out) There has been no violence and no attempted murder. There are no arrests, restraining order or charges."
The defendant offered no evidence and did not testify, although his lawyer cross-examined the plaintiff and his witnesses, argued various evidentiary issues, and made a closing argument to the judge.[6]
Discussion. The defendant first argues that the permanent order should be vacated because the original harassment prevention order was vacated. We disagree. As this court noted in the previous appeal, "[t]he one-year order at issue in [that] case has been superseded by a permanent order for which the judge has made detailed findings." Syrgala, supra. The permanent order was issued before the earlier, one-year order was vacated, and this court's prior decision does not suggest that its subsequent ruling on the one-year order created any infirmity in the permanent order.
The issue before the court is whether "the judge could find, by a preponderance of the evidence, together with all permissible inferences, that the defendant committed acts that constituted one of the enumerated forms of harassment. See O'Brien v. Borowski, 461 Mass. 415, 420 (2012) ; Seney v. Morhy, 467 Mass. 58, 60 (2014)." A.S.R. v. A.K.A., 92 Mass. App. Ct. 270, 274 (2017). We are satisfied that, considering all of the evidence before him, the judge was warranted in imposing the permanent order.
The statute. " 'Harassment' is defined in G. L. c. 258E, § 1, in several ways, and a plaintiff who proves any one of the various forms of harassment qualifies for an order prohibiting the harassment. The first definition is '(i) [three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that does in fact cause fear, intimidation, abuse or damage to property.' G. L. c. 258E, § 1 (definition of 'harassment,' subsection [i] ) (hereinafter, the first definition)." A.S.R., supra.
There is another form of harassment, described in A.S.R., supra, as the "criminal harassment" form of civil harassment. Under this definition of harassment, a plaintiff can establish the need for a harassment prevention order if the plaintiff can prove that the defendant committed one of twelve specifically enumerated crimes, in this case, as in A.S.R., a violation of G. L. c. 265, § 43A, criminal harassment. G. L. c. 258E, § 1, (definition of harassment, subsection [ii], part [B] ). See A.S.R., supra at 275. Cf. F.A.P. v. J.E.S., 87 Mass. App. Ct. 595, 598-599 (2015).
"The criminal harassment statute punishes 'whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress.' The statute specifies that conduct or acts qualifying as criminal harassment under its terms 'shall include, but not be limited to, conduct or acts conducted by mail.' " Commonwealth v. Bigelow, 475 Mass. 554, 558-559 (2016) (footnote omitted), quoting from G. L. c. 265, § 43A (a ).
Application. The defendant's actions here fit both definitions of harassment. There clearly are at least three acts of harassment, including, among others, the calls to the local police reporting "attempted murders"; the call to DCF reporting alleged neglect of the plaintiff's grandchildren because they were staying in the plaintiff's house; and the e-mail message sent to the plaintiff reporting that the defendant had "legally possessed lethal weapons" in his room-and that he was prepared to use them in self-defense.
We see no need to address the defendant's First Amendment claim about his Facebook postings and whether they could be said to be acts of harassment. We consider the postings only on the issue of the defendant's state of mind, particularly as they shed light on the issues of wilfulness and malice.[7] In addition, many of the posts constitute admissions that corroborate the plaintiff's evidence about what had occurred between the parties.[8]
Considering the first definition of harassment, it is clear that the judge could find "by a preponderance of the evidence, together with all permissible inferences, that the defendant committed '[three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that [did] in fact cause fear, intimidation, abuse or damage to property.' G. L. c. 258E, § 1, 'Harassment,' inserted by St. 2010, § 23. See O'Brien v. Borowski, 461 Mass. 415, 420 (2012) ; Seney v. Morhy, 467 Mass. 58, 60 (2014)." A.T. v. C.R., 88 Mass. App. Ct. 532, 535 (2015).
It is clear from the e-mail posts that "each of the three qualifying acts was maliciously intended, defined by G. L. c. 258E, § 1, as being 'characterized by cruelty, hostility or revenge,' and that each act was intended by the defendant to place the plaintiff in 'fear of physical harm or fear of physical damage to property.' O'Brien, supra at 427." Ibid. We note that the plaintiff testified specifically that he was physically afraid of his son, and the judge found him credible. Moreover, the judge found that the plaintiff's fears were reasonable, although that finding is not required for this definition of harassment. We also note that, "[i]n the determination whether the three acts 'did in fact cause fear, intimidation, abuse or damage to property,' it is 'the entire course of harassment, rather than each individual act, that must cause fear or intimidation.' " Ibid., quoting from O'Brien, supra at 426 n.8.
The defendant's actions also meet the definition of criminal harassment as explained in Bigelow, supra and A.S.R. v. A.K.A., supra at 276. That is, there was evidence that, by making a series of false reports to the police department and to DCF, combined with the e-mail to the plaintiff about lethal weapons, the defendant was acting maliciously and wilfully, that he directed the actions towards the plaintiff, that the plaintiff was seriously alarmed by the defendant's behavior, and that a reasonable person would also be so alarmed.
In addition, the evidence was sufficient for the judge to find that the defendant's behavior constituted a true threat. "As the court in Commonwealth v. Bigelow explained, reiterating language from O'Brien v. Borowski, '[a] true threat does not require an explicit statement of an intention to harm the victim as long as circumstances support the victim's fearful or apprehensive response. ... Nor does a true threat threaten imminent harm; sexually explicit or aggressive language directed at and received by an identified victim may be threatening, notwithstanding the lack of evidence that the threat will be immediately followed by actual violence or the use of physical force. ... '[T]he "true threat" ' doctrine applies not only to direct threats of imminent physical harm, but to words or actions that-taking into account the context in which they arise-cause the victim to fear such harm now or in the future and evince an intent on the part of the speaker or actor to cause such fear.'Commonwealth v. Bigelow, supra at 566-567, quoting from O'Brien v. Borowski, 461 Mass. at 424-425." A.S.R. v. A.K.A., supra at 281. Here, we are satisfied that the repeated accusations of attempted murder, which were determined to be unfounded, combined with the admonition that the defendant possessed "lethal" weapons that he was prepared to use in self-defense satisfy the "true threat" definition.
The defendant's remaining claims do not require a great deal of discussion. His claim that the plaintiff's case includes hearsay fails because hearsay is admissible in a hearing under G. L. c. 209A and, by implication, under G. L. c. 258E. See Frizado v. Frizado, 420 Mass. 592, 597-598 (1995) ("[T]he rules of evidence need not be followed, provided that there is fairness in what evidence is admitted and relied on"); Guidelines for Abuse Prevention Proceedings, § 5:03 (2011) ("Rules of Evidence. The common law rules of evidence, e.g., those regarding hearsay, authentication, and best evidence, should be applied with flexibility, subject to considerations of fundamental fairness").[9]
The defendant also argues that the judge's reliance on "the alleged outcome of the DCF [investigation] ignores the right of [the defendant] to petition an agency in good faith." This claim also fails. The defendant did not at any time file a special motion to dismiss under G. L. c. 231, § 59H ; nor did he argue that issue to the District Court judge. As a result, that argument is waived.[10]
Finally, because we determine that the order was properly issued, we do not agree that the plaintiff's case constituted a fraud on the court, nor that the order and the accompanying documents should be expunged from the defendant's record. See J.S.H. v. J.S., 91 Mass. App. Ct., 107, 111 (2017).
Permanent harassment prevention order affirmed.

Later, on cross-examination, the plaintiff testified that "where he sent me an e-mail stating he had lethal weapons, I certainly was afraid physically."

"ORDER IS MADE PERMANENT. Plaintiff remains in fear of the [defendant's] continuing pattern of harassment of [p]laintiff. The fears are reasonable and well founded. The harassment continues and is found serious and significant."

In the interim, as noted, on April 27, 2016, a panel of this court had remanded the case for findings from the second judge about his February, 2015, one-year extension order. That judge was unable to recall the hearing and declined to make findings.

Specifically, the redacted report states, "Reporter is alleging the neglect of the children, ... age 7 and ... age 3, by their father [Blacked out] [at a] residential building that has a chemical business in the basement. Father resides (sic) at this business .... The children are at this place of business an average of three days per week. Reporter thinks they are there during school hours;
"The paternal grandfather, [the plaintiff] also resides in the same building with his wife .... [The plaintiff] owns the building. Reporter is filing because the children come to this location and this past weekend there were 'three attempted murders' there.
"This past weekend, the paternal grandfather, [the plaintiff] 'attempted to murder' [Blacked out] ... attempted to drag [blacked out] out into the snow and lock the door [blacked out] The second attempt was [R.S.] placing a padlock around the refrigerator that contained [blacked out]'s medications-In a third attempt [R.S.] allegedly attempted to have the police throw [blacked out] out into the snow and lock the doors. The children were NOT there. [Local] Police were involved.
"Reporter is calling because [blacked out] 'the risk level to the children is extremely high.' 'If the children were there during this incident, [blacked out]'s attempt at self-defense was not successful, the children would have witnessed one or two murders.' The first murder would have been [the plaintiff's] attempt [blacked out]; the second murder could have possibly been. [blacked out] defending [blacked out] against [the plaintiff].
"Reporter wanted to add that father is not doing this intentionally. Other than having the children at a business where they may see grandfather injure [blacked out] there are no other concerns. Reporter wanted to add they are 'exemplary parents,' 'very good parents.' "

"The plaintiff must make the case for the awarding of relief. An inference adverse to a defendant may properly be drawn, however, from his or her failure to testify in a civil matter such as this, even if criminal proceedings are pending or might be brought against the defendant." Frizado v. Frizado, 420 Mass. 592, 596 (1995). We therefore draw a negative inference from the fact that the defendant did not testify or offer any evidence that contradicted the plaintiff's case.

For example, a post around the time the original order issued reads, "My breakup letter with [the plaintiff] and [the plaintiff's wife] comes tomorrow. [The plaintiff]'s gonna REGRET ... regret the day that he tried to kill me. [The plaintiff's wife] will be crying and bitching at him for the next 30 years. He just doesn't think through the consequences. Decades of prison time are not very compatible with your older, elder years." In another Facebook post from February, 2015, the defendant, who was describing his parents as "gutter trash" and complaining about the way that he had been treated, continued "even the police got pissed-'don't call us again for attempted murders unless there's blood, ax marks,' etc. etc. etc. they really said this ... LOL!"

Similarly, we do not have enough information about the defendant's lawsuit, filed against the plaintiff, other family members, and the local police department, among others, to say that it is an act of harassment.

"The Supreme Judicial Court repeatedly has cited these guidelines as an authoritative source for proceedings and orders pursuant to G. L. c. 209A. See Frizado v. Frizado, [420 Mass. at 598 n.5 ]; ... MacDonald v. Caruso, [467 Mass. 382, 388 n.8 (2014) ]; Singh v. Capuano, 468 Mass. 328, 330-331 (2014). Harassment orders under G. L. c. 258E were 'intended to protect victims who could not legally seek protection under G. L. c. 209A.' ... As the court noted, the procedures under the two statutes are very similar; as a result, we see no reason why the Guidelines for Judicial Practice: Abuse Prevention Proceedings should not apply equally in harassment order proceedings, absent some issue particular to harassment orders." F.A.P. v. J.E.S., 87 Mass. App. Ct. 595, 601 n.14 (2015).

We have carefully considered each of the arguments presented in the defendants' brief. To the extent that any particular claim has not been specifically addressed herein, we have found it to be without merit.